**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

_____

FEDERAL TRADE COMMISSION, )
)
                Plaintiff, )      Civil Action No. 08 C 1185
              v. )      Judge Darrah
)
SAFE HARBOUR FOUNDATION OF FLORIDA, )
  INC., a Florida corporation, *et al.*, )
)
             Defendants. )
_____)

**FTC'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTION**

Under the guise of a supposed mortgage foreclosure rescue operation, defendant Peter J. Porcelli, II, and his confederates found not only a new lucrative method to scam financially troubled consumers, they blatantly and systematically violated a host of federal statutes, including the Truth in Lending Act, the Home Ownership and Equity Protection Act, and the Federal Trade Commission Act. Without quick action, many victims of this scam will lose their homes and life savings. Moreover, the violations are obvious on the face of the documents themselves – the Court will not have to engage in lengthy credibility determinations to decide that preliminary relief is warranted.[1] In particular, homeowner victims continue to face the threat of foreclosures, and the defendants and their agents continue to press their fraudulently obtained interests in the victims' properties.[2]

---

[1]      As the Court is aware, Porcelli is currently incarcerated in federal prison. The FTC concluded it would be premature to file this motion until Porcelli was properly served. Despite diligent attempts at service, *see* Docket Nos. 22 & 23 (Apr. 8, 2008) (summonses returned unexecuted by U.S. Marshal's Service); Docket Nos. 37 & 38 (June 20, 2008) (same), Porcelli was not served until July 17, 2008 (Docket No. 41).

[2]      *See, e.g., In re Rocha*, No. 6:06-bk-02048-KSJ (Bankr. M.D. Fla.).

Plaintiff, Federal Trade Commission, moves for an order preliminarily enjoining the defendants from further violations of these statutes. In addition to seeking a preliminary injunction in this case, the FTC will ask the Court to rule on its motion for an order to show cause why defendants/respondents Porcelli, Bonnie Harris, Christopher Tomasulo, and others should not be held in contempt for their violations of this Court's orders in the related case, *FTC v. Bay Area Business Council, Inc., et al.*, No. 02 C 5762.[3]

I.    **DEFENDANTS' ILLEGAL SCHEME**

The FTC brought these actions because shortly after being banned from "promoting, offering for sale, or selling, directly or indirectly, Credit-Related Products to any consumer" as a result of the *Bay Area* permanent injunctions,[4] Porcelli began this new mortgage foreclosure operation. Porcelli set up a web of corporate entities, as he did with the credit card scam.[5] These three companies charged consumers thousands or tens of thousands of dollars in fees for short-term home equity loans, and if the consumers were unable to make their payments, the defendants helped themselves to their victims' home equity by simply taking their homes.

---

[3]    Docket No. 136 (February 27, 2008). The Court's order consolidating this case with *Bay Area* is at Docket No. 155 (April 30, 2008).

[4]    "Credit-Related Products" are defined in the orders as: "any product, program, or service which is advertised, offered for sale, or sold as a method by which persons may establish or obtain any extension of credit or credit device, including, but not limited to credit cards, loans, or financing, or as a method to consolidate or liquidate debts." Section II of Order for Permanent Injunction with Monetary Judgment and Other Relief Against Bay Area Business Council, Inc., Bay Area Business Council Customer Service Corp., American Leisure Card Corp., Bay Memberships, Inc., Sr. Marketing Consultants, Inc., Special Technologies, Inc., Peter J. Porcelli, II, and Bonnie Harris, *Bay Area*, Docket No. 114 (Apr. 14, 2004), PX 209; Section I of Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against Defendant Christopher Tomasulo, *Bay Area*, Docket No. 124 (Feb. 2, 2005), PX 210 . (All referenced PXs were filed in *Bay Area* on February 27, 2008).

[5]    *Bay Area*, Docket No. 112 (Apr. 8, 2004) at 12 & 15.

Safe Harbour targeted distressed homeowners, claiming in its articles of incorporation that it was a non-profit designed to "help save homeowners from foreclosure by introducing them to lenders."[6]  Obtaining lists of homeowners facing foreclosure, Safe Harbour contacted consumers, typically by sending them a flyer in the mail.  The flyer, under the heading "SAFE HARBOUR FOUNDATION, A NON PROFIT CORPORATION, FORECLOSURE RELIEF" stated:

> We have all the funds available to pay your bills
>
> and save your home from foreclosure. GUARANTEED!
>
> • Don't lose your home.
>
> • Guaranteed solution to stay in your home.
>
> • Immediate relief from financial pressures.
>
> • Stop the harassment.
>
> • Save your credit

The flyer went on to describe Safe Harbour as "having been established to give people a second chance when no one else will."[7]  It warned consumers to "[b]e careful of other companies who look to profit from your misfortune."  Continuing the same theme, the bottom of the flyer warned homeowners to watch out for "Investment Sharks," "Quick Money offers," and to not "Keep Swimming," i.e., "think . . . this will work itself out."  The flyer directed homeowners to call "Peter James" (a pseudonym Porcelli has used in the past) at a toll-free number.

Homeowners who called Safe Harbour usually reached either Porcelli, Harris, or

---

[6]    *See* PX 214 (McKenney Decl.) Att. D.

[7]    *See Heise v. Porcelli, et al.*, No. 8:07-cv-1866-T-24 MAP (M.D. Fla.) (attachment to complaint), PX 213.

Tomasulo.  Safe Harbour obtained payoff letters, foreclosure information, and other relevant

information about the property itself, but it did nothing to determine whether the homeowners

had the means to pay back a new loan; it did not perform any type of credit check or even

determine the homeowner's income before moving forward on the loan.[8]

     The loans to consumers were made and secured by Silverstone Financial or Silverstone

Lending, two companies also controlled by Porcelli, which have had the same address and are

otherwise indistinguishable from Safe Harbour.[9]  In most cases, on the same day as closing, or

shortly thereafter, Silverstone purportedly "assigned" its interest in the mortgage to third parties

– usually defendants Keystone Financial, Southeast Advertising, or MT 25 LLC.[10]

     While the amounts of the loans varied based on the current indebtedness of the

consumers, the loans were otherwise essentially identical.  Consumers received loans that

permitted them to bring their current mortgages up to date, avoid foreclosure, and (at least

temporarily) stay in their homes.  The loans all had a term of eight months or less, and were

---

[8]    *See* PX 214 (McKenney Decl.) Atts. G(2), H(2), I(17), J(20-21), K(2), L(24), M(17), N(17), O(19), P(16), Q(13), R(16), S(2), T(2), U(23), V(17), X(15), Y(17), Z(15), AA(15), BB(16), CC(15), DD(15), EE(17), HH(2), II(16), JJ(16), KK(16), LL(15), MM(15), NN(15), OO(18), PP(15), QQ(2), RR(2), SS(15), UU(16), VV(15), WW(16), XX(15), YY(16), AAA(2), BBB(13), CCC(14), DDD(15), EEE(17) (intake forms).

[9]    *See* PX 214 (McKenney Decl.) Atts. I(7-12), J(8-12), L(8-12), M(8-12), N(8-12), O(8-12), P(8-12), Q(8-12), R(8-12), U(8-12), V(8-12), W(8-11, 20-24), X(8-11), Y(6-13), Z(8-11), AA(8-11), BB(8-11), CC(8-11), DD(8-11), EE(8-11), FF(8-11), GG(8-12), II(8-11), JJ(8-11), KK(8-11), LL(8-11), MM(8-11), NN(8-11), OO(8-11), PP(8-11), SS(8-11), TT(7-10), UU(8-12), VV(8-11), WW(8-11), XX(8-11), YY(8-11), ZZ(5-9), BBB(8-11), CCC(8-11), DDD(8-11), EEE(8-11) (notes and mortgages).

[10]    *See* PX 214 (McKenney Decl.) Atts. J(16-19), L(20-23), M(20), O(27-30), P(21), R(23), U(19-22), V(22-25), W(28-31), X(20), Z(20), AA(17, 19), CC(19), DD(21-24), EE(22), FF(20-23), GG(17, 21), II(23-26), JJ(24-27), KK(20-23), LL(21), MM(20-23), NN(23-26), OO(20-23), SS(20-23), UU(20), WW(22-25), YY(19-20), BBB(18), DDD(21-24), EEE(22).

secured as second mortgages.[11]  Virtually all the loans were negatively amortized, i.e., they

provided for interest-only payments with a balloon payment to pay off all the principal and

unpaid interest on the due date.  The loans were made to look even more attractive to the

homeowners by deferring much of the interest until the loan term ended.[12]  All the loans included

hefty fees to Safe Harbour and the lender (usually Silverstone Lending).[13]  Substantial

"underwriting" fees also were charged by third parties, although these entities do not seem to

have provided anything of value to the consumers.[14]  These attendant fees and other costs were

typically nearly as large as the amount the homeowners needed to borrow to pay off the

arrearages in their first mortgages.  Although the Truth In Lending Act disclosures provided to

consumers show Annual Percentage Rates ("APRs") of 18 - 28%, most of these loans actually

have APRs, when properly computed, of more than 100%.[15]

　　　　The defendants received exorbitant fees from their victims or, in several cases, they

simply took their victims' homes.  Homeowners were either coerced or tricked into signing

---

[11]　　　*Supra* note 9.

[12]　　　*Id.*

[13]　　　*See* PX 214 (McKenney Decl.) Atts. I(3), J(3), L(3), M(3), N(3), O(3), P(3), Q(3), R(3), U(3), V(3), W(3), X(3), Y(3), Z(3), AA(3), BB(3), CC(3), DD(3), EE(3), FF(3), GG(3), II(3), JJ(3), KK(3), LL(3), MM(3), NN(3), OO(3), PP(3), SS(3), TT(3), UU(3), VV(3), WW(3), XX(3), YY(3), ZZ(3), BBB(3), CCC(3), DDD(3), EEE(3).

[14]　　　*See* PX 214 (McKenney Decl.) Atts. I(14), J(13), L(14-15), M(14), N(13-14), P(13),  U(14), W13, 25(), X(12), BB(12-13), CC(11), DD(13-14), EE(13-14), II(12), JJ(13), KK(13), LL(12), OO(13), TT(12-13), UU(13), VV(12), WW(13), XX(12), YY(12-13), ZZ(10), EEE(13-14).

[15]　　　*See* PX 214 (McKenney Decl.) Atts. I(6), J(6), L(6), M(6), N(6), O(6), P(6), Q(6), R(6), U(6), V(6), W(6, 18), X(6), Y(4), Z(6), AA(6), BB(6), CC(6), DD(6), EE(6), FF(6), GG(6), II(6), JJ(6), KK(6), LL(6), MM(6), NN(6), OO(6), PP(6), SS(6), TT(5), UU(6), VV(6), WW(6), XX(6), YY(6), ZZ(4), AAA(6), BBB(6), CCC(21), DDD(6), EEE(6) (TILA stmts).

"deeds in lieu of foreclosure," which the defendants recorded whenever the victims failed to make the required payments on their loans.[16] Without preliminary relief, many homeowners continue to face the real danger of losing their homes.

## II.    DEFENDANTS' CONDUCT VIOLATES FEDERAL LAW.

The defendants' lending business systematically violated at least four different provisions of HOEPA, seven provisions of TILA, as well as Section Five of the FTC Act. The defendants' victims -- homeowners desperate to save their homes -- unwittingly entered into loans with outrageous finance charges and other terms, and in many cases ended up so deeply in debt that they have virtually no chance of ever saving their homes, if they have not already lost them.

### A.    The Defendants Consistently Violated HOEPA.

In every single loan made by the defendants, they violated at least four different provisions of HOEPA. HOEPA, which went into effect in 1995, amended TILA to address a variety of abusive lending practices being made in connection with high-cost non-purchase money mortgage loans secured by consumers' homes. HOEPA seeks to protect vulnerable consumers -- who usually have limited incomes but sufficient home equity to secure covered loans -- by requiring creditors to disclose material information in advance. HOEPA also completely prohibits certain loan terms and practices. HOEPA applies only to very high interest rate loans (typically 10% over the yield on Treasury bills for the same time period) or loans with significant up-front points and fees (greater than $561).[17] All the loans in this case satisfy these

---

[16]    *See* PX 214 (McKenney Decl.) Att. GG(19), FFF(7), HHH(2), III(2), JJJ(8), KKK(7).

[17]    12 C.F.R. § 226.32(a)(1)(ii). The up-front point and fee trigger is satisfied if the amount exceeds the greater of $561 (adjusted annually) or 8% of the loan amount.

triggers: the APRs typically exceed the Treasury rate by at least 100% and the fees are several thousand dollars -- often more than the principal amount of the loans.

### 1.     The Defendants Engaged in Illegal Asset-Based Lending.

Every loan made by the defendants violated HOEPA's prohibition on asset-based lending.[18]  This is an especially serious HOEPA violation because it goes to the heart of the problem Congress sought to address when it enacted HOEPA.  Subprime lenders who make loan decisions solely on the basis of home equity (and not income) set consumers up to fail because they know or should know that the consumer will not be able to make required payments.

The loans in this case were based entirely on the consumers' home equity.  The defendants ran no credit checks, asked no questions about income or other assets, and in every case the consumers were facing foreclosure and thus had demonstrated that they were unable to make the required payments.

### 2.     The Defendants Required Illegal Balloon Payments.

Every loan entered into by the defendants required a final "balloon" payment by the homeowners, which also violates HOEPA.  HOEPA restricts creditors' use of a variety of loan terms that Congress found were particularly problematic.  One such practice is the making of loans with less than five-year terms which require balloon payments.[19]  The purpose of this restriction is to address the abuse inherent in requiring already financially distressed homeowners to refinance their mortgages within a short period of time.

---

[18]     TILA § 129(h), 15 U.S.C. § 1639(h), and Reg. Z § 226.34(a)(4), 12 C.F.R. § 226.34(a)(4).  Asset-based lending means making loans to consumers based on the value of their collateral without regard to their repayment ability.

[19]     TILA § 129(e), 15 U.S.C. § 1639(e), and Reg. Z § 226.32(d)(1), 12 C.F.R. § 226.32(d)(1).

All of the defendants' loans violated this restriction.  Every loan was for a term of no more than eight months and required balloon payments, making it nearly inevitable that the consumers would soon have to obtain new loans.[20]

### 3.    The Loans Included Illegal Negative Amortization Terms.

Similarly, all of the defendants' loans include negative amortization provisions.[21]   Since the excess interest is added to the principal balance of the loan, loans with negative amortization guarantee that consumers will fall farther into debt each month.  Every loan entered into by the defendants contained these negative amortization provisions, in direct violation of HOEPA.[22]

### 4.    The Defendants Violated HOEPA's Disclosure Requirements.

Independent of the violations of HOEPA based on their illegal loan practices, the defendants consistently violated HOEPA's disclosure requirements.  HOEPA requires creditors to provide a special written disclosure to consumers at least three business days before consummation of a HOEPA loan transaction.[23]  The HOEPA disclosures must include:  (1) a prescribed notice stating that the consumer is not required to complete the agreement, and warning that failing to pay the loan could lead to the consumer losing his or her home and money paid; and (2) the APR and regular payment amount (including any balloon payment).

In all or nearly all of the defendants' loans, the HOEPA disclosures were deficient, in

---

[20]      *Supra* note 9.

[21]      *Id.*

[22]      *See* TILA § 129(f), 15 U.S.C. § 1639(f), and Reg. Z § 226.32(d)(2), 12 C.F.R. § 226.32(d)(2). Negative amortization means the consumers pay less than the full amount of interest due on the loan each month.

[23]      TILA § 129(b)(1), 15 U.S.C. § 1639(b)(1), and Reg. Z §§ 226.31(b) and (c) and 226.32(c)(1), 12 C.F.R. §§  226.31(b) and (c) and 226.32(c)(1).

that the disclosures made no mention of the APR or the payment amounts. Moreover, the disclosures typically were executed on the same day as the loan itself, in violation of HOEPA.[24]

**B.     The Defendants Violated TILA.**

In addition to violating HOEPA, the defendants also routinely committed serious violations of other TILA provisions. TILA requires creditors to provide consumers with various written disclosures,[25] which primarily concern credit costs and terms, including the amount financed,[26] the finance charge,[27] the APR,[28] the payment schedule,[29] the total of payments,[30] and the fact that the creditor will be acquiring a security interest in the consumer's home.[31] A creditor must provide these disclosures to the consumer before consummation of the transaction.[32]

---

[24]     *Supra* note 9.

[25]     TILA §§ 121(a) and 128(b)(1), 15 U.S.C. §§ 1631(a) and 1638(b)(1), and Reg. Z §§ 226.17(a) and (b) and 226.18, 12 C.F.R. §§ 226.17(a) and (b) and 226.18.

[26]     TILA § 128(a)(2), 15 U.S.C. § 1638(a)(2), and Reg. Z § 226.18(b), 12 C.F.R. § 226.18(b).

[27]     TILA §§ 106 and 128(a)(3), 15 U.S.C. §§ 1605 and 1638(a)(3), and Reg. Z §§ 226.4 and 226.18(d), 12 C.F.R. §§ 226.4 and 226.18(d).

[28]     TILA §§ 107 and 128(a)(4),15 U.S.C. §§ 1606 and 1638(a)(4), and Reg. Z §§ 226.18(e) and 226.22, 12 C.F.R. §§  226.18(e) and 226.22.

[29]     TILA § 128(a)(6), 15 U.S.C. § 1638(a)(6), and Reg. Z § 226.18(g), 12 C.F.R. § 226.18(g).

[30]     TILA § 128(a)(5), 15 U.S.C. § 1638(a)(5), and Reg. Z § 226.18(h), 12 C.F.R. § 226.18(h).

[31]     TILA § 128(a)(9), 15 U.S.C. § 1638(a)(9), and Reg. Z § 226.18(m), 12 C.F.R. § 226.18(m).

[32]     Reg. Z § 226.17(b), 12 C.F.R. § 226.17(b).

The defendants routinely provided inaccurate information in the TILA disclosures, violating all of these provisions.  In particular, they significantly understated the amount financed, the finance charge, the APR, and the total of payments, misstated the schedule, and did not disclose the required balloon payments or that they were acquiring a security interest in the consumers' homes.[33]

Moreover, the assignee defendants -- Keystone Financial, Southeast Advertising, and MT 25 LLC -- are directly liable for these violations under TILA, even if they had no direct role in negotiating the loans.[34]  Thus, all of the corporate defendants, including the assignees, are liable for each of the transactions to which they were parties.[35]

**C.     The Defendants Violated FTC Act Section 5**.

By misrepresenting the APRs of their loans, the defendants violated not only HOEPA and TILA, they also violated Section 5 of the FTC Act.  An act or practice is deceptive under the FTC Act if it is shown that the defendants made a material representation or omission that was likely to mislead consumers acting reasonably under the circumstances.[36]  A statement or practice is material if it is likely to affect the consumer's decision.[37]  The defendants misrepresented the APR as to all of their loans.  The TILA disclosures claimed that the loans had

---

[33]     *Supra* note 15.

[34]     TILA § 131(a), 15 U.S.C. § 1641(a).  *See Pulphus v. Sullivan,* No. 02 C 5794, 2003 U.S. Dist. LEXIS 7080, *47-48 (N.D. Ill. Apr. 25, 2003).  TILA limits assignee liability to violations on the face of the loan documents, which is satisfied in this case.

[35]     *Supra* notes 10 and 13.

[36]     *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992);  *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir. 1988).

[37]      *FTC v. Slimamerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).

APRs of 28% or less.  In truth, the properly computed APRs were almost always greater than

100%, and in most cases, exceeded 100%.[38]

## III.    THE COURT SHOULD ENTER PRELIMINARY RELIEF.

The Commission seeks injunctive relief to prevent defendants from continuing to violate

the law and harm consumer victims.  The Court has full authority to enter the requested relief,

which is strongly supported by the evidence.

### A.    The Court has Authority to Grant the Requested Relief.

Section 13(b) of the FTC Act provides that "in proper cases the Commission may seek,

and after proper proof, the court may issue a permanent injunction."[39]  The practice of

defrauding consumers by misrepresenting or omitting material facts presents a "proper case" for

injunctive relief under the Section 13(b).[40]  Under that section, the full breadth of the court's

authority is available, including the power to grant such ancillary final relief as rescission of

contracts and restitution.[41]  The court may also enter whatever preliminary relief is necessary to

preserve the possibility of providing effective final relief, including an order freezing assets for

eventual restitution to victims.[42]  The FTC is empowered to enforce TILA and HOEPA with the

same functions and powers as enforcing the FTC Act.[43]

---

[38]    *Supra* note 15.

[39]    15 U.S.C. § 53(b).

[40]    *World Travel,* 861 F.2d at 1028; *see also FTC v. Bay Area Business Council, Inc.,* 423 F.3d 627, 634 (7th Cir. 2005).

[41]    *FTC v. Febre,* 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 571-72 (7th Cir.), *cert. denied,* 493 U.S. 954 (1989).

[42]    *World Travel,* 861 F.2d at 1026 & 1031; *see also Amy Travel,* 875 F.2d at 571.

[43]    TILA § 108(c), 15 U.S.C. § 1607(c).

11

**B.    Preliminary Injunctive Relief is Warranted.**

To grant preliminary injunctive relief in an FTC Act case, the district court must "'(1) determine the likelihood that the Commission will ultimately succeed on the merits and (2) balance the equities.'"[44]  Under this "public interest" test, "it is not necessary for the FTC to demonstrate irreparable injury."[45]  Unlike a private litigant, moreover, which generally must show a strong or substantial likelihood of success, the Commission need only make the statutory showing of a likelihood of ultimate success.[46]  And when the court balances the equities, the public interest "must receive far greater weight" than any private concerns.[47]  The public equities in this case are compelling, as the public has a strong interest in halting the deceptive scheme, and in preserving the assets necessary to provide effective final relief to victims, while the defendants, by contrast, have no legitimate interest in continuing to victimize homeowners.[48]

The evidence submitted in support of the FTC's motion, including nearly all of the loan documents for most of the transactions entered into by the defendants, establishes the overwhelming likelihood that the FTC can establish that the defendants violated HOEPA, TILA, and the FTC Act, and that preliminary relief is justified in this matter.

---

[44]    *World Travel,* 861 F.2d at 1029 (quoting *FTC v. Warner Communications, Inc.,* 742 F.2d 1156, 1160 (9th Cir. 1984)); *see also FTC v. Datacom Mktg. Inc.,* No. 06 C 2574, 2006 U.S. Dist. LEXIS 33029, at *10-11 (N.D. Ill. May 24, 2006) (Holderman, C.J.).

[45]    *World Travel,* 861 F.2d at 1029.

[46]    *Id.*

[47]    *Id.*

[48]    *See FTC v. Sabal,* 32 F. Supp. 2d 1004, 1009 (N.D. Ill. 1998).

###### C.     Porcelli, Harris, and Tomasulo are Individually Liable.

Defendants Porcelli, Harris, and Tomasulo engineered this illicit scheme and are individually liable for the violations of the FTC Act described above.  An individual may be held liable for corporate practices where he or she (1) participated directly in or had authority to control the acts or practices; and (2) knew or should have known about those practices.[49] Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."[50]  The Commission need not show intent to defraud.[51]  Instead, the knowledge requirement may be satisfied by a showing that the individual (1) had actual knowledge of the deceptive acts or practices, (2) was recklessly indifferent to the truth or falsity of the representations, or (3) had an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.[52]  The "degree of participation in business affairs is probative of knowledge."[53]

The individual defendants all meet this standard.  Porcelli was an owner, officer, and/or manager of each corporation.[54]  He signed loan documents on behalf of the Safe Haarbour and the Silverstone entities, corresponded and communicated with homeowners and third parties

---

[49]     *Bay Area,* Memorandum Opinion, Docket No. 112 (Apr. 8, 2004) at 21, *aff'd by* 423 F.3d at 636;  *World Media Brokers,* 415 F.3d at 764; *Amy Travel,* 875 F.2d at 573-74.

[50]     *Bay Area,* Memorandum Opinion, Docket No. 112 (Apr. 8, 2004) at 21.

[51]     *Id*. at 21 (citing *Amy Travel*, 875 F.2d at 574).

[52]     *Bay Area,* 423 F.3d at 636; *World Media Brokers,* 415 F.3d at 764.

[53]     *Amy Travel*, 875 F.2d at 574; *see also Bay Area,* Mem. Op., Docket No. 112 (Apr. 8, 2004) at 21-2.

[54]     *See* PX 214 (McKenney Decl.) Att. D.

with respect to the loans, and managed their day-to-day operations.[55]  Harris corresponded and communicated with homeowners, ordered appraisals on behalf of the corporations, and arranged for the loan closings.[56]  Often using a pseudonym, Tomasulo communicated with consumers and third parties on behalf of the corporations, sought and received supposedly necessary personal or financial information from homeowners on behalf of the corporations, arranged closings, and signed loan documents as a supposed "witness" at several of the closings.[57]  In fact, Tomasulo's role with the corporate defendants often seemed indistinguishable to consumers from Porcelli's role, and there is documentary evidence connecting him to at least a third of the loans for which the defendants kept files.

WHEREFORE, the Federal Trade Commission respectfully requests that the Court grant the FTC's motion for preliminary injunction and enter an order enjoining the defendants from

---

[55]        *See* PX 214 (McKenney Decl.) Atts. I(5), J(5, 17, 19), L(5, 18, 20), M(5, 21), N(5, 19, 22, 23), O(5, 18, 20, 28), P(5, 17, 21), R(5, 23), U(5, 17, 19), V(5, 16, 23, 25, 26), W(5, 29, 31), X(5, 20), Y(11, 16, 20), Z(5, 21), AA(5, 17, 21), BB(5), CC(5, 20), DD(5, 19), EE(5, 23), FF(5, 18, 20), GG(5, 17, 22), II(5, 24, 27), JJ(5, 22, 24), KK(5, 20, 24), LL(5, 21), MM(5, 20, 24), NN(5, 16, 17, 23, 27), OO(5, 17, 20), PP(5, 20, 24), SS(5, 20), TT(4, 17), UU(5, 19-20), VV(5, 8), WW(5, 22, 26), XX(5), YY(5, 19), AAA(3), BBB(5, 18), CCC(5, 15, 17, 22, 25), DDD(5, 21), EEE(5, 23), GGG(2), III(2), JJJ(4,10).

[56]        *See* PX 214 (McKenney Decl.) Atts. G(3-4), H(5), I(18-21), J(22-25), K(7-10, 12), L(25-26), M(18-19), O(18, 23-26), P(19-20), Q(14-16), R(15, 17-22), S(3-6), T(3-6), U(24-30), V(18-21), X(18-19), Y(18-19), Z(16-20), AA(16, 23-26), BB(18-21), CC(17-18), DD(16-19), EE(18-21), FF(17), GG(15-16), HH(9-10), II(15, 18-22), JJ(17-21), KK(17-19), LL(16-19), MM(16-19), NN(18-22), OO(16, 19-22), PP(16-19), QQ(4-5), RR(2-7), SS(16-19), TT(15-18), UU(17-18), VV(16-17), WW(18-21), XX(22-23), YY(18-19), ZZ(13), AAA(4-8), BBB(8, 14, 17), CCC(16-20), DDD(16-19), EEE(18-21).

[57]        *See* PX 214 (McKenney Decl.) Atts. H(3-4), N(18), V(15-16, 26), X(16-17), BB(17), CC(16), DD(20), GG(22), HH(3-8), II(17), LL(20), QQ(3,6), TT(17), UU(19), WW(17), XX(16-21).

taking any further actions in violation of law or continuing to damage their victims.  A proposed

order accompanies this motion.

Respectfully Submitted,

WILLIAM BLUMENTHAL
General Counsel

DATED: August 14, 2008              /s/ David A. O'Toole
                                    DAVID A. O'TOOLE
                                    GUY G. WARD
                                    MARISSA J. REICH
                                    Federal Trade Commission
                                    55 West Monroe Street, Ste. 1825
                                    Chicago, Illinois 60603
                                    (312) 960-5634 [telephone]
                                    (312) 960-5600 [facsimile]
                                    dotoole@ftc.gov
                                    gward@ftc.gov
                                    mreich@ftc.gov